IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

AMERICAN RELIABLE INSURANCE )
COMPANY, et al., )
)
     Plaintiffs, )
)
v. )   No. 3:19–CV–469
)
UNITED STATES OF AMERICA )
)
     Defendant. )
_____ )
)
STATE FARM FIRE AND CASUALTY )
COMPANY, et al., )
)
     Plaintiffs, )
)
v. )   No. 3:19–CV–470
)
UNITED STATES OF AMERICA )
)
     Defendant. )
_____ )
)
UNITED SERVICES AUTOMOBILE )
ASSOCIATION, et al., )
)
     Plaintiffs, )
)
v. )   No. 3:19–CV–472
)
UNITED STATES OF AMERICA )
)
     Defendant. )
_____ )
)
ALLSTATE FIRE AND CASUALTY )
INSURANCE COMPANY, et al., )
)
     Plaintiffs, )
)

v. ) No. 3:19–CV–474
)
UNITED STATES OF AMERICA )
)
    Defendant. )
_____ )
)
AUTO-OWNERS INSURANCE )
COMPANY, et al., )
)
    Plaintiffs, )
)
v. ) No. 3:19–CV–478
)
UNITED STATES OF AMERICA )
)
    Defendant. )

MEMORANDUM OPINION AND ORDER

### I. Introduction

On November 28, 2016, the Chimney Tops 2 Fire ("Fire"), the largest wildfire in the Great Smoky Mountains National Park's ("Park") history, left the Park's boundaries, burned the surrounding areas, and led to tragic losses of life and significant property damage. The Fire and the events leading up to the Fire's movement outside of the Park are at the center of the cases before the Court. The particular issue before the Court is whether the National Park Service ("NPS") was required to take mandatory, specific actions in its response to the Fire.

Whether the NPS and its employees were required to take mandatory, specific actions when responding to the Fire is significant because several groups of plaintiffs have brought lawsuits under the Federal Tort Claims Act ("FTCA") seeking compensation from the United States for its alleged negligence in handling the Fire. In response to the lawsuits, the United States filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction and argued the United States is immune from the lawsuits. This immunity, the United States argued, stems from the discretionary function exception to the FTCA. The discretionary function exception guards the United States against tort

2

claims arising from "legislative and administrative decisions grounded in social, economic, and political policy." *United States v. Gaubert*, 499 U.S. 315, 323 (1991). The United States has brought a facial attack to subject matter jurisdiction, which means the Court looks to the pleadings when ruling without taking evidence or making factual determinations.

These cases are following a similar trajectory as other, related cases currently pending in this Court. *See Reed v. United States*, 426 F. Supp. 3d 498, 501 (E.D. Tenn. 2019). In those cases, Judge Phillips ruled on a similar motion brought by the United States. *Id.* Although this Court is not bound by Judge Phillips's ruling, this Court's conclusion and reasoning are consistent with his decision.

The Court has thoroughly reviewed the complaints, motions, responses, and briefs filed in these cases, and for the reasons explained in more detail below, the United States' Motions to Dismiss are GRANTED in part and DENIED in part.

## II. Preliminary Matters

The Court will address the United States' Motions to Dismiss for Lack of Subject Matter Jurisdiction filed in five cases:

- Document 34, *American Reliable Insurance Company, et al., v. United States*, No. 3:19–CV–469;
- Document 41, *State Farm Fire and Casualty Company, et al., v. United States*, No. 3:19–CV–470;
- Document 19, *United Services Automobile Association, et al., v. United States*, No. 3:19–CV–472;
- Document 18, *Allstate Fire and Casualty Insurance Company, et al., v. United States*, No. 3:19–CV–474;
- Document 36, *Auto-Owners Insurance Company, et al., v. United States*, No. 3:19–CV–478.

The motions and responses in *American Reliable*, *State Farm Fire and Casualty Company, United Services Automobile Association,* and *Allstate Fire and Casualty Insurance Company* are identical. The Plaintiffs in these four cases will be identified as the "State Farm Plaintiffs." The

3

Motion and Response in *Auto-Owners Insurance Company* are unique. The Plaintiffs in that case will be referred to as the "Auto-Owners Plaintiffs."

For simplicity, unless otherwise noted, citations will be to the docket for *State Farm Fire and Casualty Company, et al., v. United States*, No. 3:19–CV–470. The Court will cite to this docket for exhibits, even if the discussion is in reference to an argument presented by the *Auto-Owners Plaintiffs*. Any citation to a docket other than *State Farm Fire and Casualty Company* will bear the first Plaintiff's name, for example: Auto-Owners, Doc. 36, PageID ___.

## III. Background

On November 23, 2016, a fire was discovered on one of the Chimney Tops in the Great Smoky Mountains National Park. [Doc. 1, PageID 7; Auto-Owners, Doc. 32, PageID 1938]. The Fire eventually grew beyond the Park's borders and burned the surrounding areas, leading to losses of life and significant property damage. [Doc. 1, PageID 8; Auto-Owners, Doc. 32, PageID 1955–56]. Plaintiffs filed these lawsuits against the United States for its alleged negligence in handling the Fire. [Doc. 1, PageID 16–17; Auto-Owners Doc. 32, PageID 1957, 1960, 1963, 1975]. Plaintiffs allege that the NPS and its employees failed to follow certain policies that required particular actions when responding to the Fire. [*See generally* Doc. 1; Auto-Owners, Doc. 32]. Together, the five groups of Plaintiffs allege that the United States violated policies in five documents: the Great Smoky Mountains National Park Fire Management Plan ("FMP"), [Doc. 3–2], the Fire Monitoring Handbook [Doc. 3], Reference Manual 18 ("RM–18"), [Doc. 3–1], Director's Order 18 ("DO–18"), [National Park Service, "Director's Order #18: Wildland Fire Management," (January 16, 2008), https://www.nps.gov/policy/DOrders/DO_18.pdf], and the Interagency Standards for Fire and Fire Aviation Operations ("Redbook"), [Doc. 3–3]. The Parties

4

also filed the Chimney Tops 2 Fire Review: Individual Fire Review Report ("After-Fire Report"). [Doc. 2–3].

In response to the lawsuits, the United States filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction and argued that the United States is immune from the lawsuits because of the discretionary function exception to the FTCA. [Doc. 41; Auto-Owners, Doc. 36].

After the briefs and responses were filed in these cases, the Court heard oral argument on the Motions on May 28, 2020. [Doc. 49]. At the hearing, the Parties disputed the significance of the After-Fire Report. The Court requested supplemental briefing on the issue. The Parties filed their supplemental briefs and had an opportunity to respond. The Motions to Dismiss are now ripe.

## IV. Federal Torts Claim Act Overview and Motion to Dismiss Standard

The Federal Tort Claims Act allows lawsuits against the United States:

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b); *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 535 (1988). However, there are "exceptions to this broad waiver of sovereign immunity," including the discretionary function exception. *Berkovitz*, 486 U.S. at 535; *see* 28 U.S.C. § 2680(a); *United States v. Gaubert*, 499 U.S. 315, 322 (1991). The discretionary function exception states:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

Case 3:19-cv-00474-JRG-HBG   Document 33   Filed 11/24/20   Page 5 of 28   PageID #: 1589

The Supreme Court has ruled that the discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *Berkovitz*, 486 U.S. at 535–36 (quoting *United States v. Varig Airlines,* 467 U.S. 797, 808 (1984)). The exception prevents "judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy . . . . " *Gaubert*, 499 U.S. at 323 (quoting *Varig Airlines*, 467 U.S. at 814).

The Supreme Court created a two-prong test to determine if the discretionary function exception applies. *Id.* at 328–32. The first prong is satisfied if the conduct in question was "'discretionary,' not 'controlled by mandatory statutes or regulations.'" *A.O. Smith Corp. v. United States*, 774 F.3d 359, 364 (6th Cir. 2014) (quoting *Gaubert*, 499 U.S. at 328). That is, the conduct "in question must involve an element of judgment or choice, rather than follow a federal statute, regulation, or policy specifically prescribing a course of action and leaving the employee no rightful option but to adhere to the directive." *Id.* at 364–65 (quoting *Berkovitz*, 486 U.S. at 536) (internal quote omitted).

The second prong of the test is met if the use of discretion is "the kind that the discretionary function exception was designed to shield . . . ," meaning the use of discretion must be "susceptible to policy analysis." *Id.* at 365 (quoting *Berkovitz*, 486 U.S. at 536; *Gaubert* 499 U.S. at 325). If the conduct in question satisfies the first prong of the test, then there is a strong presumption that the second prong is satisfied. *Id.* at 365. The conduct in question must satisfy both prongs for the discretionary function exception to apply. *Id.* at 364–65.

The United States can assert immunity through the discretionary function exception by filing a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the

Federal Rules of Civil Procedure. *See id.* at 359. A Rule 12(b)(1) motion can be a facial or a factual challenge to subject matter jurisdiction. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). Here, the United States has brought a facial challenge, which "is a challenge to the sufficiency of the pleading itself." *Id.* When a challenge is based on the sufficiency of the pleadings, a court accepts the material allegations in the pleadings as true and construes them "in the light most favorable to the nonmoving party." *Id.*

## V.    Chimney Tops 2 Fire Review: Individual Fire Review Report

After the Fire, the Division Chief of Fire and Aviation Management for the NPS ordered the After-Fire Report, and the After-Fire Report itself was created "by an interagency fire review team." [Doc. 2–3, PageID 73]. "This fire review team's focus was on National Park Service preparedness and response to the Chimney Tops 2 fire as it originated and burned within the [P]ark's boundaries up to the time the [F]ire left the park near 1800 hours on November 28, 2016." [*Id.*].

In the After-Fire Report, the fire review team discussed the actions of the NPS staff while responding to the Fire. Plaintiffs point to several sections of the After-Fire Report that indicate that the NPS was required to take particular actions per NPS policy. [Auto-Owners, Doc. 47, PageID 3910]. For example, "The Step-Up Plan is best described as a wildland fire preparedness plan, which specifies when fire danger increases . . . . The park identifies additional measures and staffing needs that must be taken to provide appropriate response to wildland fires." [Doc. 2–3, PageID 102].

At the hearing on May 28, 2020, the Court presented two questions regarding the After-Fire Report to the Parties. First, should the After-Fire Report affect whether any conduct was mandatory or discretionary for purposes of the discretionary function exception? And second, are

the statements in the After-Fire Report factual admissions? Only the first question is relevant for these motions; therefore, the second question will be resolved at a later time.

The United States takes the position that the After-Fire Report does not affect the discretionary function exception analysis. It argues that the discretionary function exception is based on "the express language of the particular federal statute, regulation, or agency policy at issue that informs the court's discretionary function exception analysis, not an employee's subjective views or characterizations of that statute, regulation, or policy." [Doc. 51, PageID 1614]. Because of that, it is "the text of the relevant agency policies, not characterizations in an inter-agency report, that governs the analysis of whether the policies impose mandatory directives that prescribe a specific course of conduct for employees to follow." [*Id.* at PageID 1615].

All of the Plaintiffs disagree with the United States. They first argue that for the purposes of this Motion, under the Federal Rules of Civil Procedure any facts in the Pleadings should be considered true. [Doc. 50, PageID 1604; Auto-Owners, Doc. 47, PageID 3910]. They also point to the Rules of Evidence and say that the statements are admissible evidence under Rule 801 and 803. [Doc. 50, PageID 1604]. They also argue that the conclusions in the report are admissions of fact, and those admissions are enough to establish subject matter jurisdiction. [State Farm Doc. 50, PageID 1604–06; Auto-Owners, Doc. 47, PageID 3911]. Stated another way, they argue that the After-Fire Report is conclusive that the NPS and its employees did not have discretion when responding to the Fire, and the first prong of *Gaubert* cannot be met. [Doc. 50, PageID 1604–06; Auto-owner Doc. 47, PageID 3911]. In addition to those arguments, the State Farm Plaintiffs ask the Court to give deference to the After-Fire Report's interpretation of NPS policies. [Doc. 50, PageID 1609].

The United States responds that even when accepting the After-Fire Report as true, it is not conclusive that some policies required mandatory conduct under the FTCA and *Gaubert*. [Doc. 52, PageID 1624–25]. Said differently, the United States argues that a factual conclusion in the After-Fire Report is not the same as a legal conclusion under the FTCA and *Dauber*t. [*Id.*].

The United States is incorrect that the discretionary function exception can only be based on "express language." *See Irving v. United States*, 162 F.3d 154, 165 (1st Cir. 1998) (discussing "when courts ought to consult informal rules," such as, when an "agency promulgates regulations on some topics, but not on others or when it relies on internal guidelines rather than on published regulations"). Notwithstanding that, the Court agrees with its argument that a conclusion in a report is not the same as a legal conclusion for purposes of jurisdiction, especially considering that the policies in question are written down in a formal matter. *See Gaubert,* 499 U.S. at 324. Taking the After-Fire Report as conclusive would completely ignore all the inquiries that the Court must consider under the discretionary function exception and *Gaubert*.

Therefore, for the purposes of this motion, the Court will accept the After-Action Report as factually true but will not construe the After-Fire Report's conclusion that actions were mandatory as conclusive that the discretionary function exception does not apply.

## VI.   Analysis

An analysis for the discretionary function exception has several steps. First, the challenged conduct must be defined. Then, the Court must review the policies cited by Plaintiffs and determine if the policies gave the NPS discretion when making decisions—the first prong of *Gaubert*. If the first prong is satisfied, then the Court must determine if the decisions are the type of policy judgments that the discretionary function exception was designed to shield, which would satisfy the second *Gaubert* prong.

9

1.    Defining the Conduct

When analyzing an issue under the discretionary function exception, "the crucial first step is to determine exactly what conduct is at issue." *Rosebush v. United States*, 119 F.3d 438, 441 (6th Cir. 1997) (citing *Autery v. United States,* 992 F.2d 1523, 1527–28 (11th Cir.1993)). Conduct should not be defined in a way that the discretionary function exception test becomes a negligence inquiry. *Id.* at 442. The Sixth Circuit warned against such a definition in *Rosebush* where the plaintiff tried to define the conduct as "failing to make safe" and "failing to warn of dangers." *Id.*

In this case, Plaintiffs and the United States define the conduct differently. Plaintiffs define the conduct as each challenged action or inaction, without grouping them together. [*See generally* Doc. 45, Auto-Owners, Doc. 39]. For example, Plaintiffs define the conduct as whether Park employees monitored the Fire, whether the NPS employees used a required command structure, whether NPS employees notified Park neighbors, etc. The United States argues that the Court should look at the conduct more broadly and argues that the conduct in question is the "Park Service's decision-making regarding how to combat the Fire." [Doc. 46, PageID 1569].

Here, Plaintiffs have the correct approach. They do not frame the conduct in a way that requires the Court to determine whether the Park was negligent. Unlike *Rosebush*, where the plaintiffs framed the conduct as a question of negligence, Plaintiffs frame the conduct in a manner that is separate from negligence. Conversely, the United States approach is too broad. Defining the conduct too broadly is just as dangerous as compressing negligence into the conduct because anything, if you step back far enough, is discretionary. *See Rosebush*, at 442 ("The government, however, has too broad a view of the conduct they describe as discretionary. The decision to have a campground is itself, of course, discretionary.") Therefore, the Court will use Plaintiffs'

articulation of the conduct in question and look to the Policies cited by Plaintiffs to determine if the NPS and its employees were mandated to perform a particular action in a specific manner. *Id.*

        2.    <u>Fire Monitoring</u>

State Farm Plaintiffs first challenge the NPS's decision to not monitor the Fire. [Doc. 45, PageID 1500]. According to the State Farm Plaintiffs' pleadings, the FMP, the Fire Monitoring Handbook, RM–18, and DO–18 required the Park to monitor the Fire. [*Id.*]. State Farm Plaintiffs argue that policies in these documents did not give discretion to the NPS, and the violation of such policies is not shielded by the discretionary function exception. [*Id.*].

State Farm Plaintiffs point to § 5.1 and § 5.1.1 of the FMP. Section 5.1 states, "All wildland fires and prescribed fires will be monitored for their effects on the eco-system . . . . A fire monitoring team will observe the fire, assess its potential and provide a historical record." [Doc. 3–2, PageID 900]. Section § 5.1.1 adopts the Fire Monitoring Handbook for the Park. [*Id.*]. The FMP says that the Fire Monitoring Handbook, "outlines protocols for monitoring fire weather, behavior and effects, and describes in detail all aspects of a comprehensive, state-of-the-art monitoring program." [*Id.*].

The United States argues that the FMP does not supply mandatory directives. It points to several sections of the FMP to make this argument. [Doc. 41–1, PageID 1467]. First, it highlights a portion of the Introduction, which says, "This Fire Management Plan provides long-term direction for achieving park goals related to human safety and ecosystem management . . . . This plan outlines those actions that will be taken by Great Smoky Mountain National Park in meeting the fire management goals for the park . . . . [T]his plan will help achieve resource management objectives . . ." [Doc. 41–1, PageID 1469 (quoting Doc. 3–2, PageID 847)].

The United States also points to Section 4.1, Management of Unplanned Ignitions, which states in part:

> When the objective is to put the fire out, wildfire managers may apply different strategies and tactics as part of the fire response. Aggressive suppression may be the preferred strategy for one portion of the perimeter, and on another portion of the perimeter point protection or monitoring may be the desired strategy. By taking into account the fire season, current and expected weather, current and anticipated fire behavior, fire managers can apply the best tactics to mitigate risks to the public and firefighters . . . .

[Doc. 41–1, PageID 1469 (citing Doc. 3–2, PageID 871–2)]. Another paragraph in this section says, "Beginning with the initial action to any wildfire, decisions will reflect the goal of using available firefighting resources to manage the fire in the safest, most effective, and most efficient means available while meeting identified fire management unit goals and objectives." [Doc. 3–2, PageID 872]. And last, Section 4.1.2 states, "Wildfires may be managed for multiple objectives and strategy and tactics can vary over space and time." [*Id.* at PageID 887].

The Fire Monitoring Handbook, which is incorporated in the FMP, is also cited by State Farm Plaintiffs. The relevant portion of the Fire Monitoring Handbook states:

> This handbook outlines Recommended Standards (RS) for fire monitoring within the National Park Service. These standard techniques are mandatory for Environmental (level 1) and Fire Observation (level 2) monitoring. The techniques presented for Short-term change (level 3) and Long-term change (level 4) monitoring are confined to vegetation monitoring, and will not answer all questions about the effects of fire management programs on park ecosystems . . . .

[Doc. 3, PageID 199].

The Fire Monitoring Handbook also contains a table titled, "Table 2. Smoke monitoring variables (RS) with techniques, frequencies, and recommended thresholds." [Doc. 3, PageID 214]. The table provides several variables that can be measured to obtain information about a fire, such as visibility, particulates, and smoke production. [*Id.*].

12

The United States focuses on the Fire Management Handbook's purpose to "ensure that management objectives are being met, to provide guidance that can prevent fire management problems from developing, to limit possible legal actions against the agency, and to ensure that all parks collect at least the minimum information deemed necessary to evaluate their fire management programs." [*Id.* at PageID 189]. Another section of the Fire Management Handbook says that "[d]epending on a park's management objectives, a park may need a specific monitoring design beyond or instead of the design covered in this handbook." [*Id.*]

The United States argues that the sections of the FMP and Fire Management Handbook that it cites establish that the NPS and its employees had discretion. [Doc. 41–1, PageID 1467–68]. Further, the United States says that the FMP and Fire Monitoring Handbook are not specific enough to remove all discretion. [*Id.* at PageID 1469–70].

These arguments are consistent with several cases cited by the United States, in particular, *Terbush v. United States*, 516 F.3d 1125 (9th Cir. 2008), and *Riley v. United States*, 486 F.3d 1030, 1034 (8th Cir. 2007). In *Terbush*, a man was killed by a rockslide in Yosemite National Park. *Terbush*, 516 F.3d at 1128. His parents sued the NPS for the negligent "design, construction, operation, and maintenance of the wastewater management system . . . that led to the rockfall that killed their son." *Id.* The plaintiffs alleged that the NPS failed "to implement mandated safety reviews prior to the construction of the facilities . . . and ongoing maintenance after construction." *Id.* at 1131 (internal quotation omitted). The district court dismissed the case for lack of "subject matter jurisdiction under the discretionary function exception to the FTCA." *Id.* at 1128.

On appeal, the Ninth Circuit agreed with the district court. *Id.* at 1140. Although a manual cited by plaintiffs said that it was "mandatory where the language so indicate[d]," it also said that it "generally allow[ed] for management discretion." *Id.* at 1132. Even though plaintiff pointed to

13

policies that ordered management to take certain factors into consideration, the manual indicated that it provided a framework for decisions and permitted wide variations in implementations. *Id.* at 1139–40. The court stated that the "NPS policies do not contain mandatory and specific directives to which the NPS had no rightful option but to adhere . . . . " *Id.* at 1131 (internal quotation omitted). Because the NPS had discretion, the court did not have jurisdiction over the claims brought under that manual. *Id.*

A similar analysis was performed in *Riley v. United States*, 486 F.3d 1030, 1034 (8th Cir. 2007). In *Riley*, the plaintiff was driving when he began making a right-hand turn. *Id.* at 1031. During the turn, he was hit by a pickup truck, ostensibly because a mailbox blocked the truck from the plaintiff's view at the stop sign. *Id.* The plaintiff "sued the United States, alleging that the USPS negligently placed, maintained, and failed to relocate the mailboxes." *Id.* The district court ruled that sovereign immunity applied, and plaintiff appealed. *Id.*

On appeal the plaintiff argued "that the USPS had no discretion and was bound by a document called the 'Green Book.'" *Id.* at 1033. Even though the Green Book was incorporated through a regulation, the Eighth Circuit said that the Green Book provisions were "guidelines and not mandatory." *Id.* The court pointed to language in the Green Book that stated:

> The guidance supplied by this text is based on established practices and is supplemented by recent research. This text is also intended to form a comprehensive reference manual for assistance in administrative, planning, and educational efforts pertaining to design formulation. The fact that new design values are presented herein does not imply that existing streets and highways are unsafe, nor does it mandate the initiation of improvement projects.

*Id.* at 1033–34. The Green Book also said its intent was "to provide guidance to the designer by referencing a recommended range of values and dimensions. Sufficient flexibility is permitted to encourage independent designs tailored to particular situations." *Id.* Based on those policies, "the

USPS's decision on where to locate the mailboxes was discretionary, involving an element of judgment or choice." *Id.* at 1032

The Fire Monitoring Handbook is similar to the policies in *Terbush* and *Riley*. While certain phrases could imply that certain actions are mandatory, the Fire Monitoring Handbook explicitly allows the NPS to use its discretion to pick an appropriate method that may not be listed in the Handbook. [Doc. 3, PageID 189].

This is the exact type of discretion that satisfies the first prong of *Gaubert*, which is met when a policy allows an "element of judgment or choice." *A.O. Smith Corp. v. United States*, 774 F.3d 359, 364–65 (6th Cir. 2014). Considering that the Handbook states that not all situations are suitable for implementing its own requirements, it cannot be said that that the implementations required in the Handbook are mandatory and void of discretion. Therefore, the first prong *Gaubert* prong is satisfied.

The FMP requires a slightly different analysis. While the sections cited by the United States provide discretion, the discretion is given in particular circumstances. The FMP is similar to the policies in *Terbush* where some sections of a document were mandatory, and others gave discretion. 516 F.3d at 1132. Two sections of the FMP provide an element of judgment or choice to Park employees when deciding to monitor a fire. First, Section 4.1 says, "Beginning with the initial action to any wildfire, decisions will reflect the goal of using available firefighting resources to manage the fire in the safest, most effective, and most efficient means available while meeting identified fire management unit goals and objectives." [Doc. 3–2, PageID 872]. The second section, Section 4.1.2 states, "Wildfires may be managed for multiple objectives and strategy and tactics can vary over space and time." [*Id.* at PageID 887]. Monitoring the Fire certainly falls within the management of a wildfire, and the management and response to wildfire, according to

15

the FMP, will change based on available resources, the tactics chosen, and what is considered effective, safe, and efficient. This is the type of discretion that meets the requirements for the first *Gaubert* prong.

Having determined that the Fire Monitoring Handbook and FMP meet the first *Gaubert* prong for fire monitoring, the next analysis addresses RM–18. RM–18 states plainly, "[a]ll wildland fire events must be monitored." [Doc. 3–1, PageID 496]. However, the United States again cites a section of RM–18 that gives broad discretion to the NPS. [Doc. 41–1, PageID 1467]. RM–18 says that it "is intended to be read in its entirety. While certain chapters or sections provide important guidance by themselves, there is an interrelationship among the chapters that provides clarity and continuity for the management of wildland fire . . . . " [Doc. 3–1, PageID 476]. The introduction to the RM–18 says that it "provides NPS field employees legal references, operating policies, standards, procedures, general information, recommendations, and examples to assist them in carrying out Management Policies and Director's Orders." [*Id.*].

The Court's analysis of the Fire Monitoring Handbook requires the same result regarding the RM–18. Considering the language for RM–18, which states that it contains general information, recommendations, and examples, it cannot be said that the RM–18 required any specific conduct. The RM–18 plainly states that its purpose is to provide information to assist employees in carrying out Park policies and orders. And guidance, as discussed above with *Riley*, does not require mandated conduct for purposes of the discretionary function exception. 486 F.3d at 1033–34. As to fire monitoring, RM–18 gave the NPS an "element of judgment or choice" and left discretion to NPS when monitoring fires. *A.O. Smith Corp.*, 774 F.3d at 364. This means that the first prong of *Gaubert* is satisfied as to RM–18.

16

The last policy to address for fire monitoring is Director Order 18. Plaintiffs point to language in DO–18 that states that the purpose of RM–18 is to establish "agency requirements." [Doc. 54, PageID 1500]. DO–18 goes on to say that it gives "the basic principles and strategic guidelines governing the management of wildland fire by the [NPS]." [DO–18, at 1]. It also says that "[t]he circumstances under which a fire occurs, and the likely consequences on firefighter and public safety and welfare . . . dictate the appropriate response to the fire." [*Id.* at 5]. This language, like RM–18 and the Fire Monitoring Handbook, indicates that DO–18 does not require mandatory conduct and instead gives guidelines and options. *See Reed v. United States*, 426 F. Supp. 3d 498, 507 (E.D. Tenn. 2019) ("It is clear to the Court that, in the full context, the language cited by Plaintiffs from DO[–]18 does not contain any mandatory directive.").

Having determined that the policies in the FMP, Fire Monitoring Handbook, RM–18, and DO–18 do not require mandatory, specific conduct as to monitoring fires and that they satisfy the first prong of *Gaubert*, the Court must determine if the second prong is satisfied. The second prong focuses on the conduct and the use of discretion, not necessarily the policies themselves, so it is appropriate to address fire monitoring as a whole instead of considering each individual policy. *A.O. Smith Corp.*, 774 F.3d at 365. The second prong is satisfied if the "actions in question involved the kind of policy judgment that the discretionary function exception was designed to shield." *See Gaubert*, 499 U.S. at 332; *Reed*, 436 F.Supp.3d at 504–05. The use of discretion "need only have been theoretically susceptible" to social, economic, or political policy analysis. *Jude v. Comm'r of Soc. Sec.*, 908 F.3d 152, 159 (6th Cir. 2018). Budgetary considerations and effectiveness inquiries are examples of policy analysis. *Id.*; *A.O. Smith*, 774 F.3d at 370. Importantly, there is a strong presumption that the second prong is satisfied if the first prong is met. *Jude*, 908 F.3d at 159.

Here, the United States argues that the second prong is met because "how to attack a fire is a judgment that involve[s] a balancing of considerations, including cost, public safety, firefighter safety, and resource damage, and these considerations reflect the type of economic, social and political concerns that the discretionary function exception is designed to protect." [Doc. 41–1, PageID 1482 (internal quotations omitted)]. While the Court does not view fire monitoring as necessarily the same as attacking a fire, it does agree that similar considerations are at play. When monitoring the Fire, the Park employees would have to, at least theoretically, take into consideration policy issues that the discretionary function exception was designed to protect, such as cost-benefit analysis, budget considerations, use of resources, and safety. *See also A.O.* Smith, 774 F.3d at 370. With that, the United States has satisfied the two prongs of *Gaubert* and shown that the discretionary function exception applies to the Park employees' fire monitoring conduct.

3.    Notifying Others about the Fire

Next, the State Farm Plaintiffs and Auto-Owners Plaintiffs argue that the Park violated the FMP when it did not notify others about the Fire. Section 3.3.2 of the FMP states, that "[p]ark neighbors, Park visitors and local residents will be notified of all planned and unplanned fire management activities that have the potential to impact them." [Doc. 3–2, PageID 870]. Further, Table 13 of Section 4.4.2 states the Park must "Post current fire information on websites as available," "[i]nform park neighbors of wildland fires[,]" and "[u]se [an] information officer and/or park public affairs to disseminate information . . . ." [*Id.* at PageID 897]. Plaintiffs argue that these sections are mandatory and do not give discretion to the Park.

As addressed above, the United States argues that the FMP, like the other documents, does not supply mandatory directives. While the Court agreed that the FMP gave NPS employees discretion when monitoring fires, the same cannot be said for notifying others about fires. The

18

Court said that FMP gave employees discretion when taking initial actions against the wildfire and when deciding the safest, most effective means to manage fires. However, grouping notifying others about fires into the same category as managing the fire and taking initial actions towards a fire stretches the natural reading of the FMP. Instead, the FMP is best read to contain some provisions that require mandatory conduct and other provisions that allow discretion. *Reed*, 426 F. Supp. 3d at 508 ("Accordingly, the Court cannot conclude, based on the language in the introduction to the FMP, that everything contained therein is merely a guideline.") The discretion given by the FMP should not be read broader than it states. Therefore, the first argument provided by the United States is without merit.

Next, the United States argues that the FMP is not specific enough. [Doc. 41–1, PageID 1469–70]. According to the United States, if the FMP policies are mandatory, then the discretionary function exception still applies because the policies are not specific enough to eliminate discretion. [*Id.*]. When making these arguments, the United States tries to find discretion in Section 3.3.2 and Section 4.4.2. It says that the Section 3.3.2 leaves discretion with the Park "to decide what conduct constitutes planned and unplanned fire management activities" and who gets notifications about the activities. [*Id.* at PageID 1477–78]. While the United States acknowledges that the section identifies "Park neighbors, Park visitors and local residents[,]" the United States argues the groups should be defined more specifically. [*Id.* at PageID 1478]. Without definitions, according to the United States, the NPS could choose which individuals and groups received information. [Doc. 1478]. Similarly, the United States posits that the FMP gives NPS employees discretion because the FMP "is silent as to the specific contents of the information." [*Id.* at PageID 1479]. Additionally, the United States claims that the Section does not say how to send the information. [*Id.*].

The United States makes similar arguments for Table 13 of Section 4.4.2. [*Id.*]. The United States says that the Park retained the discretion to decide what websites are available for fire-related information or when to post information. [Doc. 41–1, PageID 1479–81]. Again, the United States says the NPS has the discretion to choose how to disseminate information, who receives the information, and "the particular content of any fire-related information." [*Id.* at PageID 1481].

As an alternative to the above argument, the United States claims that both sections incorporate an "if/then" analytical structure that gives the NPS the discretion to determine when a condition is met. [*Id.* at PageID 1478, 1480]. It says that this structure is in the phrase, "'ha[s] the potential to impact'" for Section 3.3.2 and that the if/then structure is incorporated into Table 13 for when to determine whether to issue fire-related information. [*Id.*].

For its arguments, the United States relies on two particular cases from the Sixth Circuit, *Jude v. Comm'r of Soc. Sec.*, 908 F.3d 152, 155 (6th Cir. 2018), and *Myers v. United States*, 17 F.3d 890, 893 (6th Cir. 1994). In *Jude*, after a large conspiracy to defraud the Social Security Administration was uncovered, the agency suspended benefits for numerous individuals. 908 F.3d at 155. Tragically, some individuals committed suicide after learning of the suspensions. *Id.* at 156. The estate administrators for two of those individuals filed a wrongful death lawsuit against the SSA. *Id.* The United States filed a motion to dismiss, and the district court granted the motion and ruled that some claims were barred by the discretionary function exception. *Id.*

On appeal, the Sixth Circuit looked to the Social Security Act to start its analysis. *Id.* at 159. The Act provided that after learning of fraud, the Inspector General of the SSA was to tell the Commissioner as soon as he or she knew of it unless "appropriate authorities inform him that doing so would jeopardize a criminal investigation." *Id.* at 159–60 (quoting 42 U.S.C. § 1320a–8(l)). The Act goes on to say that "[t]he Commissioner of Social Security shall immediately redetermine the

entitlement of individuals to monthly insurance benefits under this subchapter if there is reason to believe that fraud or similar fault was involved in the application of the individual for such benefits, unless" a prosecutor certified that it would interfere with an investigation. *Id.* at 160 (quoting 42 U.S.C. § 405(u)(1)(A)). The Sixth Circuit determined that the first *Gaubert* prong was satisfied because the statute left "element of judgment or choice." *Id.* at 159–60. The element of judgment or choice came from the fact that the statute was silent about when the actions must occur. *Id.* The court determined that "[t]he SSA may exercise choice and judgment in fashioning a response that it deems appropriate." *Id.*

The Sixth Circuit addressed a similar issue in *Myers v. United States*, 17 F.3d 890 (6th Cir. 1994). In *Myers*, the Sixth Circuit analyzed whether mine safety inspectors had discretion when they had to follow policies with an "if/then" logical structure. *Id.* at 895. The policies cited by the plaintiffs required "antecedent assessment before a particular course of action is required . . . . " *Id.* The Sixth Circuit held that if the "antecedent assessment" required the use of discretion, then the first prong of *Gaubert* can be satisfied even if the steps after the predicate condition are required. *Id.* at 896.

The United States' arguments regarding the FMP have already been addressed in *Reed*. In *Reed*, the court determined that Sections 3.3.2 and Table 13 of Section 4.4.2 do not contain an if/then structure. 426 F. Supp. 3d at 510. The court concluded that the FMP stated that the activities in Section 3.3.2 and Table 13 are required, *id.*, and that they "are specific as to when and how warnings should occur, namely, Park neighbors should be informed in the event of a wildland fire, using various means, including the internet and information officers." *Id.*

This Court agrees with the *Reed* court. While *Jude* stands for the proposition that timing may be a part of how an agency has discretion, the court also based that decision on the complex

factual nature of determining if there was fraud and that evaluating potential fraud has an element of choice or judgment. *Jude*, 908 F.3d at 160–61. The FMP does not give that type of discretion to the NPS when required to act under Section 3.3.2 and Table 13. Similarly, the FMP does not have an if/then analytical structure like *Myers*. The FMP does not permit the investigation of fire activities and determination of risk before taking the required actions. In sum, Sections 3.3.2 and Table 13 of Section 4.4.2 require Park employees to take specific actions in specific circumstances.

Last, the United States argues that Section 4.4.2 is discretionary because Section 4.4 is titled, "Wildland Fire Operational Guidance," and the word guidance shows that the subsection is not mandatory. [Doc. 41–1, PageID 1479]. While the title may contain the word guidance, no part of Table 13 of Section 4.4.2 indicates that the NPS and its employees had discretion. The words in Table 13, Section 4.4.2 are written in a specific and mandatory manner even though the title of Section 4.4 contains the word guidance.

Having determined that Section 3.3.2 and Table 13 of Section 4.4.2 did not give the NPS discretion about notifying others about fire related information, the Court must address conflicting statements from the Sixth Circuit regarding failure to warn claims. The *Rosebush* Court ruled that "decision[s] whether to warn of potential danger is a protected discretionary function." *Rosebush v. United States*, 119 F.3d 438, 443 (6th Cir. 1997). Conversely, the *A.O. Smith* Court expressly "decline[d] to endorse" the position "that failure-to-warn claims categorically satisfy the discretionary function exception . . . ." *A.O. Smith Corp. v. United States*, 774 F.3d 359, 369 (6th Cir. 2014). Whether the *Rosebush* court intended to foreclose failure-to-warn claims or not, Section 3.3.2 and Table 13 of Section 4.4.2 do not speak of identifying hazards and warning the general public. In *Rosebush*, the plaintiffs cited policies written in general terms like, "To the extent practicable, eliminate safety hazards from recreation sites." *Rosebush*, 119 F.3d at 441.

22

Section 3.3.2 and Table 13 of 4.4.2 are not written in a general manner and are specific and focused on the transmission of specific information. Therefore, *Rosebush* does not mandate a particular decision in this case.

With those considerations, the Court, consistent with *Reed*, has determined that the first prong of *Gaubert* has not been met in regard to Section 3.3.2 and Table 13 of Section 4.4.2. Considering both prongs of the *Gaubert* test must be met for the discretionary function to apply, the second prong does not need to be addressed.

4.      Use of a Command Structure and Step-Up Plan

State Farm Plaintiffs and Auto-Owners Plaintiffs also argue that there is no sovereign immunity because the NPS did not follow policies regarding its command structure and step-up plan during the Fire. [Doc. 45, PageID 1506; Auto-Owners, Doc. 39, PageID 3765]. Specifically, Plaintiffs allege that an NPS employee failed to designate a Fire Duty Officer and a single employee improperly acted as Fire Duty Officer and Incident Commander at the same time. [Doc. 45, PageID 1506; Auto-Owners, Doc. 39, PageID 3765]. Plaintiffs point to sections of the FMP, the Redbook, and DO–18 to support their argument. [Doc. 45, PageID 1506; Auto-Owners, Doc. 39, PageID 3765].

Starting with the FMP, Table 6 of the FMP states, "The Fire Duty Officer shall not fill any [Incident Commander] function connected to any incident." [Doc. 3–2, PageID 882]. Similarly, Table 5 of Section 4.1.1 contains staffing classifications when responding to fires and says, "At [Staffing Class] 3 or above, a separate incident commander is required." [*Id.* at PageID 876]. Table 5. [*Id.*].

The Court has already discussed that certain sections of the FMP are discretionary while others mandatory. Section 4.1 of the FMP gives Park employees discretion when taking action

23

towards a wildfire based on what they decide is "the safest, most effective, and most efficient means available while meeting identified fire management unit goals and objectives." [*Id.* at PageID 872]. And Section 4.1.2 states, "Wildfires may be managed for multiple objectives and strategy and tactics can vary over space and time." [*Id.* at PageID 887]. Staff assignments, step-up plans, and dividing responsibilities among individuals in the command structure certainly fall within the category of deciding how to fight a fire efficiently with available resources. This is the type of discretion that meets the requirements for the first *Gaubert* prong.

Similar to the FMP, the Redbook says, "[Fire Duty Officers] will not fill any ICS incident command functions connected to any incident." [Auto 32–7, PageID 2753]. This language appears straightforward, but the United States, yet again, points to another section, which states, that the Redbook provides a "framework," not "absolute or immutable rules." [Doc. 41–1, PageID 1469 (citing Doc. 3–3, PageID 962)]. Further, the Redbook says it does not give "absolute rules." [Doc. 3–3, PageID 962]. Instead, the policies, "require judgment in application." [*Id.*]. Considering the Redbook specifically gives discretion to the NPS when implementing it and states that judgment is required, the first *Gaubert* prong is satisfied in regard to the Redbook.

The last policy discussed by Plaintiffs is DO–18. The Court has already determined that DO–18 does not remove all discretion from the NPS and only provides "basic principles and strategic guidelines . . . . " [DO–18, *supra*, at 1]. Likewise, the Court has already stated that DO–18 acknowledges that, "The circumstances under which a fire occurs, and the likely consequences on firefighter and public safety and welfare . . . dictate the appropriate response to the fire." [*Id.* at 5]. Id. at 5 (emphasis added). Therefore, DO–18 left discretion to the Park, and the first prong of *Gaubert* is also met here.

Like the second prong analysis for fire monitoring, the conduct in question for use of the command structure satisfies the second *Gaubert* prong when using the command structure and step-up plans to fight a fire, the Park employees would have to, at least theoretically, take into consideration policy issues that the discretionary function exception was designed to protect, such as cost-benefit analysis, budget considerations, use of resources, and safety. *Jude*, 908 F.3d at 159; *A.O. Smith Corp.*, 774 F.3d at 370. Considering the necessary policy judgments, the United States has shown that the conduct of the NPS and its employees when using the command structures and step-up plans in the FMP, Redbook, and DO–18 is shielded by the discretionary function exception.

5.    Use of Wildland Fire Decision Support System

Next, Plaintiffs argue that the United States does not have immunity because it violated policies regarding the Wildland Fire Decision Support System ("WFDSS"). [Doc. 45, PageID 1507; Auto-Owners, Doc. 39, PageID 3766]. Plaintiffs cite RM–18 and the FMP. [Doc. 45, PageID 1507–08; Auto-Owners, Doc. 39, PageID 3766]. RM–18 says, "Parks will use the current decision support process (e.g. Wildland Fire Decision Support System, WFDSS) to guide and document wildfire management decisions. The process will provide situational assessment, analyze hazards and risk, define implementation actions, and document decisions and rationale for those decisions." [Doc. 3–1, PageID 498].

Similarly, the FMP states, "Wildfire Decision Support System (WFDSS, or equivalent) will be used on each wildland fire to document the decision making process and outline strategy and tactics employed. The level of decision support documentation required will depend on the fire response level." [Doc. 3–2, PageID 872]. It goes on to say that "Every wildfire will be assessed

25

following a decision support process that examines the full range of responses . . . . Documentation of the decision process will be accomplished using the WFDSS program." [*Id.* at PageID 869–70].

As already discussed, the RM–18 is discretionary by its own terms and allow employees and the NPS to use discretion. Likewise, while the FMP does have mandatory provisions, when the objective is to manage a fire, the FMP gives broad discretion to the NPS and its employees to determine the most efficient, safe, and best tactics to address the fire, which would include using a decision support system. Therefore, the sections of the FMP and RO–18 addressing the use of WFDSS satisfy the first *Gaubert* prong.

Similarly, the second *Gaubert* prong is also satisfied. Like the analysis for fire monitoring and using a command structure, the use of WFDSS while fighting a fire would involve a balance of considerations, including public safety, firefighter safety, and resource management. These considerations influence "economic, social and political" concerns that the discretionary function exception is designed to protect. *Jude*, 908 F.3d at 159; *A.O. Smith Corp.*, 774 F.3d at 370. Having determined that Park employees had discretion when using the WFDSS and that the discretion is the type designed to be shielded by the discretionary function exception, the *Gaubert* test is satisfied as to use of the WFDSS.

### 6. Use of Complexity Analysis

The next argument is brought by the Auto-Owners Plaintiffs. They argue that the FMP required the NPS to perform a complexity analysis checklist before ordering resources. [Auto-Owners, Doc. 39, PageID 3768]. The FMP states, "The Fire Complexity Analysis is a checklist intended to guide the agency administrator in determining when a transition from extended attack to a higher qualified incident management team is necessary. Before additional resources are

26

ordered, an analysis must be completed and becomes part of the fire record." [Doc. 3–2, PageID 889].

As already addressed, the FMP gives discretion to the NPS when making decisions regarding the tactics used to manage a fire and when determining what is the safest and most efficient way to address a fire. Performing a complexity analysis is involved in the discretion left to the NPS. Therefore, the FMP gives discretion to the NPS when deciding to use the complexity analysis, meeting the requirements of the first prong of *Gaubert*.

The decision to perform a complexity analysis similarly satisfies the second prong of *Gaubert*. Using the complexity analysis falls within the second prong of *Gaubert* because its use would implicate effectiveness inquires, budget considerations, and resource allocation. *See A.O. Smith Corp.*, 774 F.3d at 370. Therefore, the *Gaubert* prongs are met, and the discretionary function exception applies regarding the performance of a complexity analysis.

### 7. Other arguments

The Auto-Owners Plaintiffs also make a last statement saying, "The Government disobeyed many other agency mandates too numerous to discuss in the limited space available, and these violations increased the impact of the Fire." [Auto-Owners, Doc. 39, PageID 3768]. But they do not elaborate other than cite to their complaint. [*Id.*]. Without any argument or other support, the Auto-Owners Plaintiffs have waived or abandoned these claims, and the Court does not need to address these points further. *See McGrew v. Duncan*, 937 F.3d 664, 669 (6th Cir. 2019).

### 8. Conclusion

Based on the documents cited by the Parties, the documents gave the NPS and its employees large amounts of discretion to address the Fire as they saw fit, but that discretion was not absolute. Section 3.3.2 and Table 13 of Section 4.4.2 of the FMP required the Park and its

employees to perform specific actions and did not give them the discretion to deviate from the policies. Therefore, the discretionary function exception to the FTCA does not apply to conduct required by Section 3.3.2 and Table 13 of Section 4.4.2, and this Court has jurisdiction over the case.

**VII.    Conclusion**

For the reasons stated above, the following Motions to Dismiss filed by the United States are GRANTED in part and DENIED in part as set forth in this Memorandum Opinion:

- Document 34, *American Reliable Insurance Company, et al., v. United States*, No. 3:19–CV–469;
- Document 41, *State Farm Fire and Casualty Company, et al., v. United States*, No. 3:19–CV–470;
- Document 19, *United Services Automobile Association, et al., v. United States*, No. 3:19–CV–472;
- Document 18, *Allstate Fire and Casualty Insurance Company, et al., v. United States*, No. 3:19–CV–474;
- Document 36, *Auto-Owners Insurance Company, et al., v. United States*, No. 3:19–CV–478.

The Clerk of Court is DIRECTED to file this Memorandum Opinion and Order in all five of the listed cases.

So ordered.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE